# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

MARK F. HINKLEY,      )
     )
     Claimant,      )
     )
v.      )      Case No. CV410-126
     )
MICHAEL J. ASTRUE,      )
*Commissioner of Social Security,*   )
     )
     Defendant.      )

## **REPORT AND RECOMMENDATION**

Claimant Mark F. Hinkley, a 59-year-old former combat medic and welder (tr. 59), seeks social security disability benefits due to bipolar disorder[1] and posttraumatic stress disorder ("PTSD").[2] (Tr. 21, 83.) He

---

[1] While the Court refers throughout this Report and Recommendation ("R&R") to Hinkley's bipolar disorder, the diagnoses were actually a bit more varied. Some sources diagnosed him as bipolar I, others bipolar II. Another doctor diagnosed him with schizoaffective disorder, bipolar type versus bipolar disorder. For simplicity's sake, the Court substitutes "bipolar disorder" for all three of the diagnoses.

[2] Hinkley initially claimed that he was also disabled based upon polysubstance abuse and hepatitis C. (Tr. 21, 83.) He admitted at the ALJ's hearing that he had not been substantially limited by his hepatitis C for a period of more than 12 months. (Tr. 1331.) Additionally, he had been sober for years. Hence, the ALJ found that polysubstance abuse and hepatitis C were not "severe" under the five-step analysis discussed *infra*. Hinkley has not disputed the ALJ's findings as to those disabilities in his brief.

filed his application for benefits in Seattle, Washington on May 27, 2004 alleging that he became disabled on March 1, 2003. (Tr. 59-61.) His claim was denied initially and on reconsideration. (Tr. 47-49, 51-54.)

Thereafter, he requested a hearing before an Administrative Law Judge ("ALJ"), which was held on August 9, 2007 in Kalispell, Montana. (Tr. 1307-1361.) The ALJ entered an order denying Hinkley's benefits application on November 5, 2007. (Tr. 16-33.) The Appeals Council denied his request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 5-9.) Hinkley, after moving to this District, filed a complaint for judicial review in this Court, contending that the ALJ erred in reaching his decision. The Court agrees, and for the reasons set forth below, recommends **REMAND** for further administrative review.

## I. STANDARD OF REVIEW

Affirmance of the ALJ's decision is mandatory if his conclusions are supported by substantial evidence and based upon an application of correct legal standards. 42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997). "Substantial evidence is something more than a mere

scintilla, but less than a preponderance." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (quotation marks and citations omitted). It "is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (quotation marks and citations omitted). If substantial evidence supports the decision, the Court will affirm "[e]ven if the evidence preponderates against the Commissioner's findings." *Id.* at 1158-1159. This Court cannot substitute its judgment for that of the Commissioner. *Barnes v. Sullivan*, 932 F.2d 1356, 1357-1358 (11th Cir. 1991).

The burden of proving disability lies with the claimant. 20 C.F.R. § 404.1512; *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). To determine whether he has met his burden of proof, the Court looks to the five-step evaluation process set forth in the Social Security Regulations. 20 C.F.R. § 416.920; *Dixon v. Astrue*, 312 F. App'x 227, 227-28 (11th Cir. 2009); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). At step one, the claimant must prove that he has not engaged in substantial gainful activity. *Jones*, 190 F.3d at 1228. At step two, he must demonstrate a severe impairment or combination of impairments. *Id.* Then, at step

3

three, if the claimant's impairment meets or equals a listed impairment, he is automatically found disabled. *Id.* If not, he must advance to step four, which requires him to prove an inability to perform past relevant work. *Id.* If he cannot perform past relevant work, stage five shifts the burden to the Commissioner to show that "there is other work available in significant numbers in the national economy that the claimant is able to perform." *Id.*

## II.   RECORD EVIDENCE

### A.   Treatment History

The record evidence shows that Hinkley has had serious trouble with drugs and alcohol for quite some time. He was admitted to the Oregon Health Sciences University Hospital, in Portland, Oregon, on August 26, 1989 after his brother-in-law found him cutting his wrists with a knife. (Tr. 162-164.) He reported that he was smoking up to one-quarter grams of cocaine per day, as well as consuming large quantities of tequila and beer. (Tr. 162.) He also advised hospital staff that he had been arrested 28 times for driving under the influence. (*Id.*) His drug screen was positive for cocaine and alcohol. (Tr. 163.)

Many years later, on June 22, 2003, he was admitted to Harborview Medical Center in Seattle, Washington, when he was found intoxicated on a local sidewalk threatening suicide. (Tr. 266.) He reported cocaine and alcohol abuse, but explained that he had been treated for several years with Wellbutrin and Depakote for bipolar disorder and had managed seven years of sobriety without a major relapse, but he stopped taking the medication and things fell apart. (Tr. 267.) He noted that two of his sisters were also diagnosed as bipolar. (*Id.*) While he reported a diagnosis of PTSD based on a "brief period of anxiety and nightmares," he had no symptoms at the time he was admitted. (*Id.*)

He remained at Harborview on inpatient treatment until July 7, 2003. (Tr. 264.) During that time, he was prescribed Effexor and lithium and began therapy. (Tr. 262-64.) At the time of his discharge, he was diagnosed as bipolar, mixed state, and as a substance abuser. [3] (Tr. 262.) He had replaced Effexor with nortriptyline but remained on

---

[3] At one point in the ALJ's decision, he makes much of the fact that an examiner found that Hinkley's problems were most likely related to major depressive disorder rather than bipolarity, and that the symptoms may not exist separate from substance abuse. (Tr. 25, citing tr. 266.) That is a blatant mischaracterization of the record. That statement came from an *interim* diagnosis upon Hinkley's *admission* to Harborview on June 22, 2003. (Tr. 266.) His discharge diagnoses, along with his treatment records over the next several years, confirmed bipolar disorder. (Tr. 262.)

lithium. (Tr. 264.) Five days later, however, he was readmitted based upon an overdose. (Tr. 225.) He reported that he did not want to live any more. (*Id.*) He again recovered under treatment and was found to be stable enough for discharge on July 23, 2003. (Tr. 228.)

While the ALJ's order notes that Hinkley did not relapse again until 2007 (tr. 23), in fact on November 15, 2003, Hinkley's "significant other" called 911 about another drug overdose. (Tr. 199.) He was taken to the hospital yet again, this time having consumed all at once a months' worth of psychiatric medication. (*Id.*) Thereafter, for the most part, he has done well, avoiding all but the one relapse mentioned by the ALJ.

Starting in 2004, Hinkley received exhaustive treatment through the VA. He began receiving VA benefits on February 10, 2004 based upon his PTSD.[4] (Tr. 69-73.) While still living in Seattle, Washington, he was regularly seen by VA doctors. In August 2004, Dr. Bondurant, a board certified psychiatrist, assessed Hinkley as suffering obsessive

---

[4] The report noted that he had truthfully represented that he was a combat medic in Vietnam and a subsequent VA examination showed him to have "severe and significant PTSD symptoms of near continuous depression and suicidal ideation." (Tr. 70.) He was only awarded 70% benefits, however, and it noted that "there is a likelihood of improvement" so his award was subject to future review. (Tr. 71.)

compulsive disorder, PTSD, and "schizoaffective [disorder], bipolar type versus bipolar [disorder]." (Tr. 444.) He was prescribed, among other things, divalproex (generic Depakote), mirtazapine, prazosin, quetiapine, and zolpidem. (Tr. 444-45.) At the time, Hinkley was also on interferon treatment for hepatitis C. (Tr. 445.)

He continued to suffer through depression-based episodes, tremors, and fatigue largely due to medication combinations and interferon treatment. (E.g., tr. 650-51, 631, 601, 584.) He reported some manic symptoms in late 2006, and was observed to be talking rapidly, gesturing frequently, and tapping his foot. (Tr. 758.) In early 2007, the VA lowered his disability rating. (Tr. 734.) In March 2007, he began reporting an increase in PTSD symptoms after visiting with family in Montana. (Tr. 728.) But he remained clean and sober and stated that he found the trip to be enjoyable. (Id.) Thereafter, he returned to Montana, reportedly because the cost of living was too high in Seattle under his current VA benefits. (Tr. 897.)

On June 16, 2007, he was admitted to an emergency room after another attempted suicide -- he had ingested a large quantity of temazepam. (Tr. 892.) He was intubated overnight due to respiratory

depression. (Tr. 893.) He was discharged into the care of Dr. William Brown, a physician with the VA in Spokane, Washington. (Tr. 893.) He stayed there until July 4, 2007. (Tr. 897.) His discharge diagnoses were posttraumatic stress disorder, bipolar I, and substance abuse. (*Id.*) At discharge, he was prescribed quetiapine and prazosin for PTSD and lamotrigine, mirtazapine and bupropion (generic Wellbutrin) for depression and PTSD. (*Id.*) He returned to Seattle, where he immediately went back into his former treatment routine, with some changes in medication. (Tr. 1045.)

By November, he moved back to Montana. (Tr. 901.) He presented at the Western Montana Mental Health Center on November 23 with complaints of depression, manic mood, and PTSD. (*Id.*) While there, he again reported that he had multiple DUIs and had two sisters with bipolar disorder. (Tr. 904.) His treating clinician, Dr. Claudia Vogl, opined that he suffered from bipolar, PTSD, and alcohol dependence, and listed his recent move and financial problems as stressors. (Tr. 906.) In January 2008, he reported to Vogl that he had been reinstated to his previous disability amount (tr. 914), but the actual VA reinstatement

order is not in the record.  He also noted that he planned to visit his niece in Georgia.  (Tr. 914-15.)

## B.    Relevant Medical Opinions

On September 25, 2004, Dr. Sasha Ericksen, M.D. examined Hinkley on a Washington State Disability Determination Services ("DDS") referral.  (Tr. 287.)  Dr. Ericksen diagnosed him with bipolar mood disorder, type 1, and PTSD.  (Tr. 291.)  The doctor also noted that he had at least 3 to 4 decompensations per year and "may not be reliable with being able to complete tasks."  (Tr. 292.)  Hinkley, according to Ericksen, would also benefit from having someone manage his funds, since his manic episodes often involved huge spending sprees.  (Tr. 291.)  In conclusion, Ericksen stated that claimant

> appears to be able to work only in a situation where he would not have people walking behind him, as this makes him extremely nervous.  He has tried to go back to work and he has been unable to do so.  I believe that if he were in the right situation, he would be able to complete tasks without supervision.

> On his presentation today, the claimant seemed reliable and able to complete regular attendance.  However, his history again is consistent with multiple episodes of noncompliance and decompensation.  I do not believe that in the long term that he would be able to complete a regular workweek on a month-to-month basis.

(Tr. 292.)

In a December 2004 disability impairment questionnaire completed by his treating Nurse Practitioner Nonah Sullivan, she noted that he had high fatigue at the time from interferon treatment, and ultimately concluded that he was markedly limited in every major working activity. (Tr. 296-97.) She concluded that his symptoms would only worsen in a competitive work environment, and he could not work on a sustained basis. (Tr. 297-98.) His bipolarity was dramatically destabilized by the interferon treatment. (Tr. 298.) She opined that he is not a malingerer. (*Id.*)

In December 2004, Dr. Richard Reis, who treated Hinkley at the Harborview Medical Center, completed a disability worksheet noting that Hinkley had bipolar type I, PTSD, and drug dependence. (TR. 301.) He reported that Hinkley experienced poor memory, sleep disturbances, mood disturbances, emotional lability, substance dependence, psychomotor agitation or retardation, paranoia, feelings of worthlessness, difficulty thinking and concentrating, suicidal ideation, social withdrawal, decreased energy, manic syndrome, intrusive recollections of a traumatic experience, and generalized anxiety. (Tr. 302.) He found him to be markedly limited in the ability to maintain

attention and concentration, maintain a schedule, complete a normal work week without interruption, accept instructions, respond appropriately to changes in work setting, travel, and setting realistic goals. (Tr. 304-6.) He noted moderate and mild limitations in other areas. (*Id.*) He also opined that Hinkley was not a malingerer. (Tr. 307.) Additionally, he noted that Hinkley would likely miss at least three workdays per month. (Tr. 308.)

On December 12, 2004, Alex Fisher, Ph.D., another DDS clinician, noted that Hinkley met the listing for substance addiction disorders and had an affective disorder, but a residual functional capacity assessment would also be required. (Tr. 498.) He noted that there was no evidence of decompensation *under conditions of sobriety* and that the treatment notes for the last year did not substantiate the PTSD diagnoses. (Tr. 510.) However, Hinkley did suffer from a chronic mood disorder, identified elsewhere in the report as bipolar syndrome (tr. 501), which would allow him to work only when carrying out detailed instructions with minimal public contact. (Tr. 510.) In the attached residual functional capacity assessment, Dr. Fisher noted only moderate limitations in the ability to maintain attention, the ability to complete a

normal workweek and workday without interruption, the ability to interact with the public, and the ability to respond to changes in the work environment. (Tr. 494-96.) According to Fisher, Hinkley needed a structured, routine environment, as he would have trouble dealing with stress associated with frequent changes. (Tr. 496.)

Some notes from the treatment records are also instructive here. Dr. Miles Hohenegger, Ph.D., opined in a rather exhaustive analysis on January 20, 2004 that Hinkley suffered from PTSD and bipolar disorder. (Tr. 492.) Based on the assessment, he concluded that Hinkley was unemployable at the time (though largely due to his drug dependency) and could not be trusted as his own fiduciary. (*Id.*)

Dr. Bondurant, a longtime treating physician, wrote a letter on Hinkley's behalf on December 29, 2006 regarding the lowered VA disability award. (Tr. 736.) He explained:

> I am writing this letter in support of Mr. Mark Hinkley. . . . I am his treating psychiatrist at the Veterans Affairs Puget Sound Health Care System (VAPSHCS) Seattle division, and have been treating him since 7.21.04. He has done extremely well in treatment at the Addictions Treatment Center, and has remained clean and sober for almost 3 years now. He is also being treated for several severe psychiatric issues, including schizoaffective D/O, Bipolar type and Post-Traumatic Stress Disorder. His Schizoaffective disorder, Bipolar Type was being treated prior to me seeing him 2.5 years ago. He was followed by Rick Reis, MD at

12

Harborview Medical Center. Mr. Hinkley's last manic episode was in July 2003 and he was subsequently hospitalized for mania at Harborview. He has suffered extensive depressive episodes since then, several of which have been at the VA. His PTSD was made evident in an evaluation done in our PTSD clinic. He had high and very high ratings of PTSD symptomatology by SEQ scale (done 8/4/05) and by interview (8/17/05) by Dr. Erik Jackson (see VA notes for details).

Mr. Hinkley has been maintained on aggressive psychopharmacological agents which have helped to some degree. He is currently on 2 mood stabilizers (Lamotrigine, and Quetiapine; the Quetiapine [is] also helpful for psychotic symptoms), 2 antidepressants (Mirtazapine, and Bupropion), Prazosin (for PTSD related nightmares), Clonazepam (for anxiety), and Zolpidem (for sleep). He also continues in clinic for regular followup[s]. In addition to this, he has suffered through treatment of his Hepatitis C, and has done well in that treatment. Despite some positive outcomes, his illnesses continue to cause significant problems, and have allowed a delicate balance between being able to come to the VA and remaining isolated and depressed. He frequently isolates because of his illnesses. He is trying to reconnect with family members, which has helped with his self-esteem.

Mr. Hinkley has been considered fully disabled and unemployable in the past. It is not clear to me why this rating is changing. In my professional opinion he continues to be unemployable and fully disabled. Asking this gentlemen to work would be tantamount to pushing him over the edge psychiatrically. The stress of employment and socializing with others, and requirements therein, will be too much.

(Tr. 736-37.) In his treatment records, Bondurant notes:

It is not clear to me how anyone could think this vet is able to work with his severe psychiatric disabilities. The stress of any kind of work would be major hardship, and I continue to believe that it

13

would be detrimental to his ongoing precariously balanced mental health. It has taken multiple years to get [patient] to this point where he is able to leave his house, and attend CD support group, or appts at the VA despite multiple major psychiatric medications. His schizoaffective D/O, Bipolar type and his PTSD are severe enough to warrant full disability. . . .

(Tr. 740-41.)

### C. Hearing Testimony

At the hearing, Hinkley offered his own opinion as to his disabilities. He stated that he has "not really been convinced that the bipolar [diagnosis] is true -- you know, a real problem because from what I understand bipolar is that you're manic and then you're depressed and I very rarely felt like I was manic, you know, where you're just, I guess, full of energy and ready to go. I mean I think my major problem has always been the depression." (Tr. 1325.) While he still reported suffering PTSD-related nightmares and bouts of severe depression, he admitted that he thought he could return to work on his current medication regimen so long as his hours were limited to 8 per day. (Tr. 1324; *see generally* tr. 1307-61 (hr'g tr.).)

## III. ANALYSIS

This is an unusual case. Despite nearly a thousand pages of treatment records and other medical evidence, the ALJ found no step-

two "severe" impairments and denied Hinkley's claim without proceeding to steps three, four, or five. (Tr. 16-33.) In other words, he found that Hinkley's bipolar disorder and posttraumatic stress disorder were not severe impairments. (Tr. 21-33.) Step two, however, is generally easily surmountable with a treatment record of the sort presented in this case, even taking into consideration claimant's rather startling admission that he could return to his prior work given certain minor environmental adjustments.

An ALJ may dismiss at step two if the alleged impairments do not meet the applicable severity or duration requirements. 20 CFR §§ 404.1520(a)(4)(ii) & 416.920(a)(4)(ii); *see* 20 CFR § 404.1521 (defining a severe impairment as one that significantly limits one's physical or mental ability to do basic work activities). While the regulations use terms like "severe" and "significant," the step-two threshold is not a high one. Step two is "designed to screen out only clearly groundless claims." *Jones v. Astrue*, 2011 WL 1587731 at *7 (S.D. Ga. March 29, 2011). It screens out "those applicants whose medical problems could 'not possibly' prevent them from working." *Stratton v. Bowen*, 827 F.2d 1447, 1452 n.9 (11th Cir. 1987) (quoting *Baeder v. Heckler*, 768 F.2d 547,

551 (3d Cir. 1985)); *see Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) ("The severity regulation increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account."); 70C Am. Jur. 2d *Social Security and Medicare* § 2006 (2011) (all that must be shown is a *de minimis* impairment or combination of impairments "which are of medical severity sufficient to significantly limit physical or mental ability to do basic work activities").

Indeed, the Eleventh Circuit has described the step-two test as the "slight abnormality" test. *Bridges v. Bowen*, 815 F.2d 622, 625 (11th Cir. 1987) (*per curium*). Under that test, "an impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Id.* It "allows only claims based on the most trivial impairments to be rejected." *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986). The claimant's burden is "mild." *Id.* Too, "the application of a threshold severity regulation that is greater than *de*

*minimis* is invalid under the terms of section 205 *et seq.* of the Social Security Act." *Stratton*, 827 F.2d at 1453. That is because "[a]n overly stringent interpretation of the threshold severity requirement violates the statutory standard for disability by precluding an administrative determination of the crucial statutory question: Whether, in fact, the impairment prevents the claimant from working, given the claimant's age, education and experience." *Id.*

The applicable severity regulation here explains that the ALJ must find some level of impairment (mild, not marked) in the categories of: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; along with (4) episodes of decompensation. 20 CFR § 404.1520a(c)(3). Decompensation is key, here. Without a finding of decompensation, the impairment is generally considered non-severe at step-two. 20 CFR § 404.1520a(d)(1). In other words, if Hinkley had mild impairments in the first three areas *and* experienced periods of decompensation, he has a severe impairment at step two according the regulations. 20 CFR § 404.1520a(d)(1).

Here, the ALJ wandered between varying sets of regulatory standards. Initially, he relied upon step-three criteria rather than employing the step-two rubric. He explained:

> The listings for mental disorders are arranged in eight diagnostic categories. Each diagnostic category consists of a set of clinical findings, the "A" criteria, one or more of which must be met, and which, if met lead to a test of functional restrictions, the "B" and "C" criteria, two or three of which must also be met. The purpose of the "A" criteria is to medically substantiate the presence of a mental disorder.
>
> The purpose of the "B" and "C" criteria is to describe those functional limitations associated with mental disorders, which are incompatible with the ability to work. The restrictions listed in the "B" and "C" criteria must be the results of the mental disorder manifested by the clinical findings in the "A" criteria. The factors included in the "B" and "C" criteria have been chosen because they represent functional areas deemed essential to work. An individual who is severely limited in these areas is presumed to be unable to work.

(Tr. 24.) According to the ALJ, while Hinkley met the "A" criteria for anxiety, PTSD, and major depression (as opposed to bipolar), he did not meet any of the "B" criteria, which required a showing of two of the following: (1) marked restrictions in activities of daily living; (2) marked difficulty in maintaining social functioning; (3) marked difficulty in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation. (Tr. 32.) That framework, however, solely addresses

the step-three listing criteria for mood disorders, not step-two severity requirements. 20 CFR Part 404, Subpart P, App'x 1, listing 12.04. The ALJ certainly had good grounds for finding that Hinkley did not meet the step-three listing for bipolar disorder, but that finding *does not* support a step-two severity dismissal.

The ALJ also suggested that "marked" disease symptoms must last for twelve months or the episodes of decompensation must last for three months in order to meet the durational requirement for disabilities. (Tr. 24, 32.) Again, that is relevant later in the proceedings, but it is certainly not germane to step two. According to SSR 82-52, when an ALJ denies a claim based upon insufficient duration at step two, he must show that the record clearly establishes that there is expected to be such a sufficient restoration of function that there will be *no* significant limitation of the ability to perform basic work-related functions. *Id.* In other words, a durational denial early in the analysis must show that any step-two "severe" disabling medical condition will essentially disappear. That is certainly not the case here. Based upon Hinkley's treatment record, substantial evidence shows that Hinkley *still* suffers from bipolar disorder (or at least a major mood disorder) and PTSD. The ALJ's

finding, then, is more in line with a residual functional capacity analysis, which would be undertaken later in the five-step sequence after finding that the step-three criteria were not met. There, the durational requirement changes. An ALJ may find the durational requirement has not been met where there was a sufficient restoration of function and despite significant remaining limitations, the individual can perform his past relevant work or otherwise engage in substantially gainful activity. *Id.* In such situations, "a thorough documentation, evaluation, and rationalization of the claimant's [residual functional capacity], work history, and vocational potential will be necessary." *Id.* The ALJ failed to make any such findings on the record, though his analysis strongly supports a finding that Hinkley does maintain the residual functional capacity to return to work.

At the end of his opinion, however, the ALJ swung back to the step-two regulatory framework explained above, and based upon the step-two criteria, he denied Hinkley's claim. (Tr. 33.) Again, to survive step two a claimant must have some level of impairment (mild, not marked) in the categories of: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; along with (4) episodes of

decompensation. 20 CFR § 404.1520a(c)(3). The ALJ concluded that Hinkley had mild limitations in the functional area of daily living, mild limitations in social functioning, mild limitations in concentration, but suffered *no* periods of decompensation. (Tr. 32, 33.) In making that determination, the ALJ adopted the opinion of Dr. Martin, a non-treating, non-examining source whom he had called to the hearing. While Dr. Martin's testimony supports the first three findings of "mild" limitations, her testimony did not, as the ALJ suggested, show that Hinkley suffered no periods of decompensation.

Dr. Martin explained that claimant had a mood disorder under disability listing 12.04 and PTSD under 12.06 (as well as addiction under 12.09, but that was immaterial). (Tr. 1342-43.) When directly asked by the ALJ whether the disorders had caused "marked" work limitations over a 12 month period, she stated that they had not. (Tr. 1346.) However, she noted that there were periods of time -- two or three weeks at a time -- where he would have fallen within the "marked" limitation range. (Tr. 1347-48.) Fairly reading her testimony, Dr. Martin

suggested that claimant *did* suffer from periods of decompensation,[5] though they were infrequent and of limited duration. (Tr. 1346-48.) The record further supports that finding, as nearly every treating source opined at some point that Hinkley suffered through periods of decompensation. Based upon the step-two rubric, then, the ALJ's finding that claimant's mood disorder was not severe is not supported by substantial evidence.

While there is very likely substantial evidence to support a finding that Hinkley does not meet the step-three criteria and retains the residual functional capacity to return to work, he has certainly

---

[5] While she stated that there was "[n]ot decomensation in the sense of having to have inpatient hospitalization," she explained that his symptoms fluctuated and at times required more support when his symptoms were exacerbated or he isolated. (Tr. 1346-47.) When allowed to complete her train of thought, Dr. Martin explained that there were two or three week periods of time where Hinkley's symptoms were markedly worse and he isolated. (*Id.*) Sometimes he didn't leave his apartment for weeks at a time. (*Id.*)

According to the Listings, episodes of decompensation are "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." *See* 20 CFR Part 404, Subpart P, App'x 1. Here, Dr. Martin explicitly found that when Hinkley's symptoms were exacerbated, he experienced "B criteria," which included marked restrictions in performing activities of daily living, social functioning, and maintaining concentration, persistence, or pace. (Tr. 1346-48.) In other words, there were periods of decompensation but no hospitalizations she believed were linked to the disorders. Stating that she found no periods of decompensation, then, misrepresents her testimony when viewed in its entirety, but the Court is cognizant of the fact that she never stated the "magic words."

surmounted step two. The ALJ clearly erred in finding otherwise. The regulations thus require the Commissioner to continue on to steps four and five. Consequently, this case must be remanded for further proceedings. Because the ALJ erred in denying Hinkley's claim at step two, the Court need not consider his claims that the ALJ misapplied the treating physicians rule, erred in evaluating his credibility, or gave insufficient weight to the VA's disability determination. [6]

---

[6] The Court notes, however, that the ALJ seems to have over-read the VA's opinion. The opinion, according to the ALJ,

> noted the claimant's impairment was significant given his dependence upon cocaine and alcohol, and a 100 percent evaluation was not warranted as there were no gross impairments in thought process, communication, delusion or hallucinations, inappropriate behavior, persistent danger of harming himself or others, intermittent inability to perform activities of daily living, disorientation or memory loss. Further, the claimant's condition was not considered permanent and would likely improve with continued treatment: A representative payee was recommended due to the claimant's history of polysubstance abuse.

(Tr. 26-27.) The VA determination, however, solely addressed Hinkley's PTSD, not his bipolar disorder. The VA only awards disability compensation for service related disabilities. *See* Department of Veterans Affairs Website, www.vba.va.gov/bln/21/compensation/#bm01 (site last visited May 31, 2011). While it provided treatment for his bipolar disorder, compensation was limited to PTSD. In other words, the VA's suggestion that he may overcome his PTSD did not at all suggest that Hinkley would recover from bipolar disorder. Additionally, despite the language, the determination suggests that claimant *did* have a significant impairment at the alleged onset date.

## IV.  CONCLUSION

Based on the foregoing, this case should be **REMANDED** to the

Commissioner for further proceedings.

**SO REPORTED AND RECOMMENDED** this _31st_ day of May,

2011.

_[signature]_
_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA